**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MELISHA A. SALISBURY,

        Plaintiff,

  v.                                Civil Action 2:19-cv-5277
                                     Chief Judge Algenon L. Marbley
                                     Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Melisha A. Salisbury brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this case for rehearing to the Commissioner and the Administrative Law Judge ("ALJ") pursuant to Sentence Four of § 405(g).

    **I.**      **BACKGROUND**

Plaintiff filed her applications for DIB on February 18, 2016, alleging that she became disabled on October 20, 2015, due to multiple sclerosis (MS), atrial fibrillation, and optic neuritis. (Tr. 312, 347). After her application was denied initially and on reconsideration, the ALJ held a video hearing on October 11, 2018, at which Plaintiff, represented by counsel, testified. (Tr. 199–227, 32–67). The ALJ denied Plaintiff's application for benefits on December 4, 2018. (Tr. 11–24). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff initiated this action seeking review of the Commissioner's decision on December

2, 2019 (Doc. 3), and the Commissioner filed the administrative record on March 2, 2020 (Doc.

9). This matter is now ripe for consideration. (*See* Docs. 10, 11).

   **A. Relevant Hearing Testimony**

   The ALJ summarized Plaintiff's hearing testimony:

   The claimant was diagnosed with multiple sclerosis on the alleged onset date. She testified that the primary reason she is unable to work is "extreme fatigue." The claimant explained that she needs to sleep after being up for two hours. She said that her daughter prepares meals and washes the dishes and her son attempts to assist with outside work. The claimant explained that her husband works so much that she still tries to mow the yard and keep up with the lawn.

   The claimant testified that her children do most household chores prior to visiting friends or going out. She said she "pretty much" stayed in bed. The claimant noted that her tendency to stay in bed was due to both mental and physical challenges. She said that she enjoyed crocheting but could not do it for prolonged periods. The claimant explained that her hands cramp up.

   The claimant testified that she used to enjoy fishing and hunting. She reported negative impacts on these hobbies as well. The claimant estimated that she last went hunting two years ago. Now when it gets cold, she cannot go. The claimant said that she only hunted for deer because that was the only thing she was able to eat. She was not able to recall the weight of the deer but noted that her brother-in-law assisted her in dragging it. The claimant said it was a 12-point. She last went fishing about two weeks ago. She said she either sits in the car, plays on her phone, or sits on the bank. The claimant noted that they liked to catch fish to eat them.

   The claimant testified that she had been trying to remodel her home. She explained that she was doing minor things, such as painting and hole patching. Although the claimant reported that she has been working on it since last fall, she noted that they have yet to complete one room. The claimant states that she is unable to progress on the room due to fatigue.

   The claimant testified that her pain and numbness had progressed to all four extremities. She estimated that it began in July 2018. The claimant noted that her physician prescribed her a handicapped placard and a cane. She noted that she was not able to walk for any distance and she had a history of falls. The claimant stated that she injured her left knee after falling. The claimant reported that she started using the cane five to six months ago.

   The claimant testified that her arms get so tired that she was not even able to fix her hair. She estimated that she could not use her arms more than 30 minutes before feeling fatigued. The claimant added that she continued to have visual

2

> disturbances. She explained that she has difficulty focusing because of blurry vision. The claimant reported continued respiratory problems. Although she will be tobacco free for one year in November, the claimant said she was on 2 different inhalers. She noted that if she gets active, she becomes short of breath.

(Tr. 17–18).

### B. Relevant Medical Records

> The ALJ also summarized Plaintiff's treatment history:
>
> The claimant was diagnosed with multiple sclerosis after presenting with symptoms consistent with that neurological finding, such as visual disturbance, vertigo, optic neuritis, headaches, poor balance, and intermittent pain with numbness. The claimant has also been troubled with a history of asthma and tobacco use, chronic back pain, orthostatic hypotension, left knee bursitis/partial tear and paroxysmal atrial fibrillation.
>
> The claimant was enrolled in a clinical trial for a therapeutic drug for multiple sclerosis at OSU Eye Physicians and Surgeons in January 2016. Initially, the claimant reported constant left eye pain, intermittent vision loss in the left eye and intermittent right-sided headaches . . . .
>
> The claimant demonstrated improvement with compliance to the clinical trial. The claimant presented to Dr. Katz in August 2016. She denied headaches, loss of vision, eye pain/irritation, redness and discharge. Dr. Katz observed no evidence of macular edema. His assessment was multiple sclerosis, examination of participant in clinical trial, encounter for therapeutic drug monitoring, subjective vision disturbance bilateral and optic neuritis of the left . . . .
>
> The claimant is followed by Amjad Rass, MD, for primary care. Dr. Rass observed that the claimant generally appeared well. He consistently described the claimant's motor function as "normal" and symmetrical. Dr. Rass described the claimant's gait and station as "normal" and her sensation as "intact." In July 2016, the claimant told Dr. Rass that she had generalized joint pain and continued to sleep a lot. The claimant complained of intermittent visual problems on the right. Dr. Rass noted that the claimant was followed for a trail [*sic*] study for MS patients[.] . . .
>
> The claimant's multiple sclerosis symptoms continued to be stable and caused at most only moderate limitations with compliance with recommended medical treatment . . . . She underwent pulmonary function testing in August 2016. Michael Rache, MD concluded that the pulmonary function study was "normal[.]"
>
> Linda Swallie, CRNP, observed lower extremity edema on examination in March 2017. The claimant told Ms. Swallie that she had stopped smoking since

3

November 2016.  She advised the claimant to wear knee highs . . .

Dr. Racke's treatment records consistently documents the claimant's symptoms and impairments as no more that "mild" in severity.  Often his examinations and studies showed the claimant as being "within normal limits."  The claimant's mental status exam was within normal limits in October 2015 and April 2016.  Dr. Racke observed in October 2015 that the claimant's symptoms were currently "mild" in severity.  In December 2015, Dr. Racke described the claimant's physical exam as "within normal limits" . . .

In July 2017, Ms. Swallie reported that the claimant's motor function was "normal" and symmetric.  Her sensation was "intact."  The claimant ambulated with a "normal" gait and station.  Ms. Swallie observed no drift.  The claimant's grip was equal.  The claimant told Ms. Swallie that she had had vertigo since her MS diagnosis . . .

The claimant underwent a course of physical therapy beginning in May 2018.  By June 2018 after eight weeks, the claimant showed significant improvement in strength and functional endurance based on her tolerance.  Alicia Scherf, PT, DPT, of Southeastern Med's Sports Medicine and Rehabilitation noted that the claimant denied any pain.  The claimant's evaluator observed that the claimant continued to demonstrate improved ease and tolerance to the sessions . . .

The claimant had an MRI of her left knee in June 2018 due to pain and swelling.  The impression was small-moderate size suprapatellar bursal effusion, bone marrow edema, and/or trabecular fracture of lateral tibial plateau, intrasubstance/partial tichness tear and edema of the popliteus tendon at/near it [*sic*] femoral condylar attachment.  Otherwise, no acute MRI abnormality of the left knee . . .

Based on her study, the claimant was referred to Dr. Falk.  She was ordered crutches and right knee support.  Linda Swallie, CRNP, observed that the claimant's motor function was normal and symmetric.  The claimant told Ms. Swallie that she had mowed and ran the trimmer over the entire yard yesterday.  She said she had applied ice to decrease swelling . . .

The claimant's [*sic*] sought treatment from Vanessa L. Falk, MD, in July 2018 for her left knee.  She noted that it was catching and clicking.  She explained that she had fallen on it a few months ago.  The claimant denied using any bracing or pain medication.  On examination, Dr. Falk noted "mild" pain with patellar compression.  There was no evidence of patellar instability.  There was no pain with meniscal maneuvers. Sensation was "intact" to light touch distally.  Dr. Falk reviewed the diagnostic studies.  She found that the catching and clicking was likely from her patellofemoral joint.  Although the claimant had "mild" pain with patellar compression, she reported no pain with catching.  Dr. Falk discussed quad exercises to increase her quad strength and provided a brace to support her knee.

    The claimant was instructed to follow up as needed . . .

(Tr. 18–21).

### C. The ALJ's Decision

The ALJ found that Plaintiff has the following severe impairments: MS, asthma, tobacco abuse, chronic back pain, vertigo, orthostatic hypotension, left knee bursitis/partial tear, paroxysmal atrial fibrillation, headaches, and optic neuritis. (Tr. 14). The ALJ concluded, however, that none of Plaintiff's impairments, either singly or in combination, met or equaled a listed impairment. (Tr. 15).

As for Plaintiff's RFC, the ALJ found:

> [t]he claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) performing all postural movements occasionally, except never climbing ladders, ropes or scaffolds; avoiding concentrated exposure to extreme cold or heat, excessive humidity and irritants, such as fumes, odors, dust and gasses, avoiding all hazards, such as dangerous moving machinery and unprotected heights, capable of frequent near and far visual acuity; job must accommodate the use of a cane or other assistive device for ambulation or balance.

(Tr. 16).

Turning to the relevant opinion evidence, the ALJ considered the opinion from consultative examiner Dr. Ellen Offutt, who opined that Plaintiff's ability to "perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling, as well as pushing and pulling heavy objects was at least 'mildly' impaired." (Tr. 19). The ALJ afforded Dr. Offutt's opinion "little weight," explaining it was "not specific regarding what work-related activities [Plaintiff] is capable of performing and of little value in the crafting of the residual functional capacity." (*Id*.). The ALJ then afforded the opinion from treating physician Dr. Michael Racke "partial weight," explaining it was inconsistent with his treatment records. (Tr. 20). The ALJ also afforded the opinion from treating physician Dr. Amjad Rass "partial weight," noting it,

5

too, was inconsistent with his treatment records. (Tr. 21).

Relying on testimony from a vocational expert, the ALJ found that Plaintiff was "capable of performing past relevant work as a medical secretary and a medical assistant combination job" because such work did not require the performance of work-related activities precluded by Plaintiff's RFC. (Tr. 22). The ALJ further found that Plaintiff could perform other jobs that exist in significant numbers in the national economy such as information clerk, document specialist, or surveillance system monitor. (Tr. 22–23). She concluded, therefore, that Plaintiff has not been under a disability, as defined by the Social Security Act, since October 20, 2015, through the date of the ALJ's decision. (Tr. 23).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial

evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983))

### III.  DISCUSSION

Plaintiff raises three specific errors: (1) the ALJ erred in failing to afford the opinions of her treating physicians controlling weight; (2) the ALJ erred in her evaluation of the opinions of the consultative examiner and state agency physicians; (3) the ALJ erred in failing to classify her depression as severe and failing to discuss the impact of that impairment as part of her RFC analysis. (*See generally* Doc. 10).

#### A. Treating Physician Dr. Amjad Rass

It appears from the record that Plaintiff began seeing Dr. Rass as early as May 2008. (*See* Tr. 620). As for the relevant time period, beginning in October 2015, Plaintiff saw Dr. Rass, as well as his nurse practitioner, Linda Swallie, for a multitude of symptoms, including those related to her MS diagnosis. On July 17, 2018, Dr. Rass completed a treating source statement. (Tr. 869–70). He noted Plaintiff's diagnoses as MS, atrial fibrillation, optic neuritis, iron deficiency anemia, pernicious anemia, chronic fatigue, and GERD. (*Id.*). For her associated symptoms, he listed intermittent dizziness, persistent fatigue, left knee pain, palpitations, headache, stress incontinence, falls, weakness, and positional vertigo. (*Id.*).

Dr. Rass opined that Plaintiff would be limited to sitting or standing less than two hours in an eight-hour workday; would need to take unscheduled, one-hour breaks every hour; and noted that her muscle weakness, pain, paresthesia, numbness, and chronic fatigue made such breaks necessary. (*Id.*) He also opined that Plaintiff was limited to grasping, turning, or twisting objects, and reaching in front or overhead less than 20 percent of an eight-hour workday and could perform fine manipulation for less than ten percent of an eight-hour workday. (*Id.*) He further opined that

7

Plaintiff would be "off task" more than 25 percent of a typical workday and would likely be absent from work four or more days per month. (*Id.*)

Because Dr. Rass is a treating physician, two related rules govern how the ALJ was required to analyze his opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x. 377, 384 (6th Cir. 2013) (internal quotation marks omitted) (quoting 20 C.F.R. § 404.1527(c)(2)).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x. 543, 550–51 (6th Cir. 2010). In order to satisfy the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). The good reasons rule exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

8

541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted).

"Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely*, 581 F.3d 399 (alterations in original) (quoting *Rogers*, 486 F.3d at 243). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

The ALJ did not satisfy either step. To begin, in considering Dr. Rass's opinion, the ALJ did not perform the mandatory controlling weight analysis. (*See* Tr. 21). And "[b]ecause of [this] omission[], there is no way to ensure a meaningful review of whether the ALJ evaluated Dr. [Rass's] opinions under the correct legal criteria necessitated by the treating physician rule." *Chapman v. Comm'r of Soc. Sec.*, No. 3:19-CV-00205, 2020 WL 3971402, at *3 (S.D. Ohio July 14, 2020) (citing 20 C.F.R. § 404.1527(c)(1)–(6)).

On top of that, the ALJ failed to give good reasons for discounting Dr. Rass's opinion. She gave only one explicit reason for affording the opinion partial weight—and not a good reason at that. She explained simply that it was "inconsistent with his treatment record" as "Dr. Rass consistently noted normal gait and station, as well as intact sensation. (Exhibit 23F)." (*Id*.). Importantly, "an ALJ may not summarily discount a treating-source opinion as not well-supported by objective findings or being inconsistent with the record without identifying and explaining how the substantial evidence is purportedly inconsistent with the treating-source opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020). Instead, the ALJ should "identify the

9

specific evidence in the record that supports a finding that a treating physician's opinion was inconsistent with other substantial evidence in the record and apply the factors listed in 20 C.F.R. § 404.1527(c)(2)—length of the treatment relationship, frequency of the examination, nature and extent of the treatment relationship, supportability of the medical source, consistency of the medical opinion, specialization of the treating physician, and other important factors." *Davis v. Comm'r of Soc. Sec.*, No. 2:17-CV-995, 2020 WL 1305030, at *7 (S.D. Ohio Mar. 19, 2020) (citing *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)). At a minimum, an ALJ must "build an accurate and logical bridge between the evidence and the result." *Foster v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 709, 717 (S.D. Ohio 2019) (quotation marks and citations omitted).

The ALJ's perfunctory analysis does not satisfy that standard. To begin, "Exhibit 23F," upon which the ALJ seems to rely, does not contain Dr. Rass's purportedly inconsistent treatment notes, but rather his treating source statement. So the Court is left without a reference to the records the ALJ seemingly found inconsistent with Dr. Rass's opinion. Even more problematic, the ALJ's thin reasoning does not "build an accurate and logical bridge between the evidence and the result." *Foster*, 382 F. Supp. 3d at 717.

As noted, the ALJ apparently found Dr. Rass's opinion inconsistent with his treatment records, explaining that "Dr. Rass consistently noted normal gait and station, as well as intact sensation." (Tr. 21). Similarly, earlier in her opinion, the ALJ noted that Dr. Rass "observed that the claimant generally appeared well" and "consistently described" her motor function, gait, and station as "normal" and her sensation as "intact." (Tr. 18). But Dr. Rass and Ms. Swallie said much more about Plaintiff's health. While they may have circled on a form that Plaintiff "appeared well" or had "normal" gait, station, and motor function, their handwritten comments reveal more to the story. For example, when Plaintiff presented to Dr. Rass's practice on January 5, 2016, Ms.

10

Swallie circled that Plaintiff "appear[ed] well" and had "normal" gait and function. (Tr. 721). But Ms. Swallie also reported that Plaintiff was being referred to a MS clinical research trial and noted Plaintiff's "atypical chest pain" and complaints of dizziness. (*Id.*). Indeed, Dr. Rass's and Ms. Swallie's treatment notes consistently note Plaintiff's joint pain, fatigue, and other symptoms consistent with her MS diagnosis (*see, e.g.*, Tr. 718, 747, 748, 873, 889, 899); atypical chest pain, palpitations, and dizziness (*see, e.g.*, Tr. 721, 889, 899); migraines, blurred vision, and other vision problems (*see, e.g.*, Tr. 725, 768, 873); and GERD (*see, e.g.*, Tr. 770).

In other words, while the ALJ appeared to find Plaintiff's purportedly normal gait and station significant, she does not explain why these findings mean that Plaintiff would not need breaks as recommended by Dr. Rass or have difficulty standing or walking for extended periods of time. At bottom, it is simply unclear from her opinion whether the ALJ considered the totality of Dr. Rass's and Ms. Swallie's records, especially to the extent they correspond with Dr. Rass's opinion that Plaintiff would need to take unscheduled breaks during the workday due to muscle weakness, pain, and chronic fatigue. (Tr. 869).

More broadly, the record shows that Plaintiff saw Dr. Rass, as well as his nurse practitioner, Ms. Swallie, for over a decade. True, the ALJ was not required to expressly note that she considered this factor or the other relevant regulatory factors, including the frequency Plaintiff received treatment, the nature and extent of their treatment relationship, whether Dr. Rass's opinions were supported by other record evidence, or Dr. Rass's medical specialization. But she was required to make her reasoning specific enough to ensure "meaningful appellate review." *Rogers*, 486 F.3d at 243 (quotation marks and citation omitted). And her opinion does not do that. *See, e.g.*, *Carter v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 998, 1007 (S.D. Ohio 2015) ("A review of the record reveals that Dr. Shaw treated Plaintiff for over ten years through Schear Family

11

Practice before rendering his opinion in 2006. The ALJ's perfunctory rejection of Dr. Shaw's opinion never mentions the length of the treating relationship—a factor he was required to consider upon declining to accord Dr. Shaw's opinion controlling weight. Nor does the ALJ address the medical evidence in Dr. Shaw's notes . . ."); *Barnhill v. Astrue*, No. CIV.A. 6:08-248-DCR, 2009 WL 902432, at *5 (E.D. Ky. Mar. 31, 2009) (citation omitted) ("While good reasons may exist for the rejection of Dr. Wyatt's opinions, the fact remains that the ALJ failed to adequately articulate these reasons in his decision. As shown above, the ALJ devoted only two sentences to [treating physician's] opinion. These two sentences do not fulfill the dual purpose of the good reasons requirement[.]").

The Commissioner offers other reasons that the ALJ could have used to discount Dr. Rass's opinions—*i.e.*, they were not supported by other record evidence, Dr. Rass's manipulative limitation opinions in the treating source statement were internally inconsistent, and Dr. Rass's opinions about Plaintiff's likely absences were speculative. (Doc. 11 at 8–9). A reviewing court, however, is not permitted to accept such *post hoc* arguments. *See, e.g.*, *Hosea v. Saul*, No. 3:17-CV-509-DCP, 2019 WL 4016205, at *7 (E.D. Tenn. Aug. 26, 2019) (alteration in original) (quotation marks and citations omitted) ("The Commissioner attempts to identify evidence in the record to discount Dr. Moore's opinion, other than evidence from his own treatment notes, however, the Court finds that such efforts constitute a post-hoc rationalization in support of the ALJ's decision. . . . The ALJ's failure to adequately explain the reasons for the weight given to a treating physician's opinion *denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record."). Thus, allowing the Commissioner to remedy the ALJ's failure to apply the good reasons rule would undermine the rule's dual purpose, which

is to ensure that Plaintiff understands the administrative disposition of her case and to facilitate meaningful judicial review. *Hargett*, 964 F. 3d at 552 (quoting *Blakley*, 581 F.3d at 407).

Finally, the Magistrate Judge is not convinced, nor does the Commissioner argue, that the ALJ's error was harmless. Specifically, the Undersigned find that the "limited circumstances" supporting a finding of harmless error apply here. *See Hargett*, 964 F. 3d at 554 (citing *Wilson*, 378 F.3d at 547) (noting the "limited circumstances" supporting harmless error include, for example, where the Commissioner made findings consistent with the treating source opinion). Because, however, proof of disability is not overwhelming, the Undersigned recommends remanding this matter for a rehearing rather than awarding Plaintiff benefits. *See Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 923–24 (S.D. Ohio 2016).

### B. Remaining Assignments of Error

Because the ALJ's analysis of Dr. Rass's opinion supports remand, the Undersigned need not address Plaintiff's other arguments. If the Court adopts this Report and Recommendation, on remand, the Commissioner may opt to address any of Plaintiff's other alleged errors.

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination **REMAND** this case under Sentence Four of § 405(g).

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination

13

of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: September 4, 2020 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE